United States Court of Appeals
Fifth Circuit

**F I L E D**

April 18, 2006

Charles R. Fulbruge III
Clerk

UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

No. 04-70031
_____

JOSEPH BENNARD NICHOLS,

Petitioner - Appellant,

versus

DOUGLAS DRETKE, Director,
Texas Department of Criminal Justice -
Institutional Division,

Respondent - Appellee.

Appeal from the United States District Court
For the Southern District of Texas
No. H-92-36

Before JONES, Chief Judge, and DAVIS and GARZA, Circuit Judges.

EDITH H. JONES, Chief Judge:[*]

This case is before us a second time, following the exhaustion in the state courts of a <u>Brady</u> claim that surfaced during Nichols' first federal habeas proceeding. The basis for that claim, the State's alleged suppression of identifying information for an eyewitness to the offense, has been discussed at length (or otherwise noted) by several courts. <u>See</u> <u>e.g.</u>, <u>Nichols v. Scott</u>, 69 F.3d 1255, 1259-65 (5th Cir. 1995); <u>Ex Parte Joseph</u>

_____

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

Bennard Nichols, No. 21,253-02 (Tex. Crim. App. March 12, 2003); Nichols v. Collins, 802 F.Supp. 66, 79 (S.D. Tex. 1992).

The district court denied Nichols a certificate of appealability (COA). In an abundance of caution, we grant COA based on the admonition in Miller-El I[1] that a petitioner's "claim can be debatable even though every jurist of reason might agree, after . . . the case has received full consideration, that petitioner will not prevail." Id. at 338, 123 S. Ct. at 1040. However, for reasons stated herein, we conclude that Nichols has not demonstrated that the Texas courts unreasonably applied Brady to the facts of his case. Thus, we deny his request for habeas relief.

## I. PROCEDURAL BACKGROUND

In 1982, a Texas jury convicted and sentenced to death Joseph Bennard Nichols for the 1980 capital murder of Claude Shaffer, Jr. The Texas Court of Criminal Appeals ("TCCA") affirmed Nichols' conviction on April 13, 1988. Nichols v. Texas, 754 S.W.2d 185 (Tex. Crim. App. 1988), cert. denied, 488 U.S. 1019, 109 S. Ct. 819 (1989). Nichols filed his first state habeas application on May 23, 1991, which the TCCA denied later that year. In January of 1992, Nichols filed his first federal habeas petition. During an evidentiary hearing granted by the district court, Nichols contended that the State had suppressed information

_____

[1] Miller-El v. Cockrell, 537 U.S. 322, 123 S. Ct. 1029 (2003) ("Miller-El I").

concerning a material, exculpatory witness in violation of Brady v. Maryland, 373 U.S. 83, 183 S. Ct. 1194 (1963).  The district court ordered the State to release and retry Nichols and expressly preserved Nichols' Brady claim for state exhaustion purposes. Nichols v. Collins, 802 F.Supp. 66, 79 (S.D. Tex. 1992).  This court reversed the district court's grant of habeas relief. Nichols v. Scott, 69 F.3d 1255 (5th Cir. 1995), cert. denied, 518 U.S. 1022, 116 S.Ct. 2559 (1996).

Nichols filed his second state habeas application on December 23, 1996, to exhaust his Fourteenth Amendment Brady claim. The TCCA remanded Nichols' case for an evidentiary hearing.  The state habeas court found that although the State failed to inform defense counsel properly of the location and true identity of an eyewitness, Teresa Ishman,[2] her testimony was neither exculpatory nor material.  Thus, the state habeas court rejected Nichols' Brady claim and denied his request for habeas relief in 2001.  The TCCA affirmed the state habeas court in 2003. Ex Parte Nichols, No. 21, 253-02 (Mar. 12, 2003), cert. denied, 504 U.S. 1218, 124 S. Ct. 1504 (2004).

On July 10, 2003, Nichols filed his second federal habeas petition based on the Brady claim, which the district court denied on the merits.  The court also sua sponte denied Nichols a COA.

---

[2]    Ishman is also referred to as "Teresa McGee" and "McGee" in the record because "McGee" is the name that she was using at the time the offense occurred.  Her other aliases include "Teresa Henry" and "Tina Henry."

3

<u>Nichols v. Dretke</u>, No. H-92-36, slip op. (S.D. Tex. May 25, 2004). Nichols then filed the instant petition for COA before this court.[3]

## II. THE CRIME AND THE PROSECUTION

On October 13, 1980, Nichols, Willie Ray Williams, Charlotte Parker, and Evelyn Harvey drove to an apartment building in Houston, Texas, intending to rob a nearby grocery store. Committing the robbery was Nichols' idea. Armed with guns, Nichols and Williams entered the grocery. Seventy-year old Claude Shaffer, Jr. ("Shaffer") was working as a deli clerk behind the counter. Nichols pointed his gun at Shaffer, and Shaffer made a movement that Nichols interpreted as gun retrieval. Nichols then shot at Shaffer. Williams also shot at Shaffer while fleeing the store, but he returned to the counter to take the cash box. Shaffer was killed by one bullet to the back. Parker and Harvey drove Nichols and Williams away from the scene. The quartet were arrested soon thereafter.

---

[3]     Because neither side addressed the issue, we requested letter briefs from the parties inquiring whether Nichols' second federal habeas petition qualifies as "successive" under 28 U.S.C. § 2244(b)(2)(B). They correctly responded that Nichols' petition is not successive because, after Nichols discovered and requested resolution of his <u>Brady</u> claim in the midst of the evidentiary hearing for this first federal habeas petition, the habeas court dismissed the claim without prejudice to refiling for state exhaustion purposes. <u>See e.g.</u>, <u>Stewart v. Martin-Villareal</u>, 523 U.S. 637, 644, 118 S. Ct. 1618, 1621-22 (1998).

4

The State's first attempt at prosecuting Nichols ended in a mistrial.[4] A description of Nichols' second trial appears in this court's previous opinion:

In February 1982, Nichols was tried before another jury on the same indictment. Generally the same evidence was presented as at his first trial in July 1981. The prosecutor was the same as in that first trial. In the guilt/innocence phase, Williams was called as a defense witness but claimed his Fifth Amendment privilege and refused to testify. The defense then put in evidence Williams' testimony as given at Nichols' first trial. At the close of the evidence on the guilt/innocence stage of the trial, the trial court extensively instructed the jury on the Texas law of parties (see note 9, *supra*) such that the jury could, depending on what else it found, find Nichols guilty as charged either for personally having fired the fatal shot or for the fatal shot fired by Williams, if that was done pursuant to and in furtherance of their conspiracy to rob the deli and should have been anticipated by Nichols as a result of carrying out the conspiracy. The defense argued, as it had at Nichols' first trial, that Williams fired the fatal shot from the deli door as he exited and came back in, and that this was, in the words of the charge, "the separate act of Willie Ray Williams, acting independently," for which Nichols would not be responsible. The state primarily argued that Nichols fired the fatal shot. *But*, it also argued extensively, in the alternative, that even if Williams had fired the fatal shot, Nichols was guilty of capital murder under the law of parties. The jury returned its verdict finding Nichols guilty of capital murder.

At the subsequent punishment phase the state submitted evidence that Nichols had been convicted of

---

[4] That Nichols' first case resulted in a mistrial does not inform our analysis as "inconsistent verdicts are constitutionally tolerable." Dowling v. United States, 493 U.S. 342, 353-54, 110 S. Ct. 668, 675 (1990). In any event, Nichols has failed to set forth information regarding events that led to the mistrial in his first case, especially in light of the state habeas court's rejection of his proposed finding that the jury in the first trial focused on whether Shaffer pulled a gun. As such, Nichols has failed to demonstrate how any inconsistency between his first and second trials "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the [second jury's] verdict." Kyles, 514 U.S. at 435, 115 S. Ct. at 1566.

5

theft in 1979, and had pleaded guilty in May 1980 to an April 1980 robbery for which he was sentenced in July 1980 to nine years' felony probation, which he was serving when he committed the instant offense. Additionally, it was shown that on August 13, 1980, Nichols committed an armed robbery of a convenience store, shooting the clerk in the shoulder when he did not respond speedily enough to Nichols' demand for more money. Nichols continued to demand more money as the clerk was bleeding from his wound. Further, on October 11, 1980, two days before the present offense, Nichols committed another robbery of a convenience store, aiming his pistol at the clerks. There was also evidence that when booked into jail following his arrest for the instant offense, Nichols had stated he would "shoot any deputy that got in his way." Finally, there was evidence that in June 1981, while in jail awaiting trial, Nichols conspired with others to engage in an escape involving the use of a firearm and other weapons. The defense called fifteen witnesses. Many testified they thought Nichols could be rehabilitated, that he was nineteen at the time of the offense, and that at school he had had average grades, had been an excellent athlete, and had presented no disciplinary problems. His parents divorced when he was seven, but both maintained a good relationship with him. He married, and dropped out of school, at about age seventeen to support his young child. His parents thought he had gotten into trouble due to the pressure he was under to support his young child and because he got in with a bad crowd.

The court submitted the three punishment special issues to the jury (see note 6, *supra*). No instruction was given respecting the law of parties. The defense argued, among other things, that the fatal shot was fired by Williams, and that any shooting was in reaction to Shaffer's having grabbed his gun. Emphasis was put on Nichols' youth, his family, his character witnesses, and his potential for rehabilitation. The state argued that Nichols fired the fatal shot, but did not argue any of the special issues solely on that theory. It stressed Nichols' prior offenses and conduct in jail. Neither side argued that the verdict of guilty established or meant that Nichols fired the fatal shot, or that any of the special issues were to be answered by reference to Williams', rather than Nichols', state of mind or conduct or the like. On February 26, 1982, the jury returned its

6

verdict answering all three special issues in the affirmative, and the court sentenced Nichols to death.

Nichols did not testify at either stage of his February 1982 trial.

The charge also submitted the lesser included offense of murder.

Thus, for example, the prosecutor argued:

> 'This lawsuit, if you really boil it down, concerns itself with parties, the law of parties given to you in number five and number six of this charge. Note that in parties *to be guilty of capital murder* as a party to it, *a defendant does not have to fire the fatal shot* that killed somebody.' (Emphasis added).

The prosecutor further argued:

> 'The Judge has instructed you to find the defendant guilty of capital murder if you believe from the evidence, number one, that he's involved in a conspiracy to rob, number two, that at the time of the robbery he was doing something to help or make that robbery successful, that there was a murder and that somebody had the specific intent to kill somebody, *either Jojo had it or Willie had it, either one. It doesn't matter*. That the murder was done in furtherance of the original plan of the robbery, to help it in some way or to get away, immediate flight therefrom. And you must believe that this murder was an offense that the defendant should have anticipated.
>     If you believe those five things from the evidence it will be your duty to find that man guilty of capital murder.' (Emphasis added).

Additionally the prosecutor argued:

> 'The defense is saying that what you really have here is a situation where there are cracks in the law and we want you to let Jojo Nichols slip through these cracks and get away. Well, the legislature thought about

that. They're not completely dumb up there. Somebody told them what to do. *And they have the law of parties.* It fills in the cracks. It's like the mortar in a brick wall. You guys are all responsible when you go in there with loaded guns under certain conditions. Was there a conspiracy to rob, rob them of anything, money, guns, anything else. Was there a conspiracy to rob. The defense admits that, yes, there was. When the robbery occurred, was Jojo doing anything to promote or assist that robbery? The defense admits, yes, he was pointing a gun, telling you to put money in the sack and fired a gun. The defense admits it. He fired a gun before he ran out that door.

Was there a murder? You bet. *And it doesn't matter who killed him under our law, under this rule of parties.* Was it reasonable to expect that this could happen? Of course.' (Emphasis added).

For example, in respect to the first special issue, dealing with deliberateness, the prosecutor argued:

'Was his conduct deliberate. *He doesn't have to fire the fatal shot.* But was *his* conduct deliberate. You bet it was deliberate. It was even more than that. He planned that robbery. He picked that store. It was a premeditated robbery. He thought about the fact that he's going to need a gun when he went in there. You know that he meant to use it because it was loaded and you know he fired that gun into an innocent man.' (Emphasis added).

Nichols v. Scott, 69 F.3d at 1262-64 (footnotes omitted).

It should also be noted that Nichols (in his confession), Williams (through his prior testimony), and deli employee Cindy Johnson all testified about the series of events and shots inside the deli during the robbery. Nichols told his confederates as they

drove from the scene that he thought he had shot Shaffer in the chest and that Williams shot Shaffer in the shoulder. Williams' testimony was that when he and Nichols drew guns on Shaffer, Shaffer pointed a gun at them, and Nichols shot at Shaffer first; Williams shot at Shaffer as Williams was fleeing toward the door. Johnson had given an initial police statement indicating that Shaffer squatted behind the counter reaching for a gun. At trial, however, she disavowed this statement as a mistake and testified firmly instead that Shaffer did not reach for anything. Finally, the medical examiner's testimony tended to support the State's theory that Nichols shot Shaffer, although the fatal bullet was not identified and this conclusion was based on inference from the bullet's trajectory through Shaffer's body.

## III. THE **BRADY** VIOLATION

The current habeas petition involves the State's alleged suppression of Ishman's location and identity. The following facts were developed in the state habeas hearing. Ishman, a deli employee, was also inside the store during the robbery and shooting. She left the scene just as the police arrived. The deli owner, Dean McDaniel, informed police of Ishman's departure. An officer, running outside to catch Ishman, saw a black female enter a vehicle but was unable to stop her at that time. McDaniel informed the police that Ishman asked not to work at the deli right after the shooting, that she requested employment at another

9

establishment he owned, and that he fired her instead. Nichols' defense counsel were aware of McDaniel's statements concerning Ishman.

Ishman was later located by a prosecutor and an investigator prior to the Williams trial. She was extremely uncooperative and initially denied witnessing the crime. The State's prosecutor informed Nichols and his counsel in writing that the police had interviewed Ishman, but claimed that he did not recall the substance of the interview.

In preparation for Nichols' second trial, the State attempted to subpoena Ishman in Houston under the name "Teresa McGee," but the subpoena was returned marked "return to sender, undeliverable as addressed." An investigator for the prosecution then traced Ishman to her hometown of Bogalusa, Louisiana, and ascertained that she had been in scrapes with the law there. The State concluded that Ishman was not a credible witness and dropped her from its witness list.

The state habeas court found that the State knew Ishman/McGee's true name, location, and Social Security number, and, thus, also knew that Ishman could not be served at the address used on the subpoena. However, the state habeas court refused to find that the State failed to disclose Ishman as a witness or that the State knew the substance of Ishman's testimony before Nichols' trial. The state habeas court also found that although Ishman had informed a prosecutor, prior to the Williams trial, that she saw

10

Shaffer draw a gun before Nichols and Williams fired their guns, there was also credible evidence that Ishman failed to provide this information to the police or to the prosecutor responsible for Nichols' trial. The state habeas court further found that, as part of the State's argument that Nichols fired the fatal shot, the State relied heavily on the testimony of Cindy Johnson. However, the state court rejected Nichols' proposed finding that the jury focused on whether Shaffer pulled a weapon. Finally, the state habeas court concluded that Nichols failed to show that Ishman's testimony would have been material in light of the record as a whole.[5]

## IV. STANDARD OF REVIEW

Nichols filed his petition for a writ of habeas corpus after the effective date of the Antiterrorism & Effective Death Penalty Act ("AEDPA"), 28 U.S.C. § 2254, April 24, 1996. Therefore, the petition is subject to the procedures imposed by AEDPA and post-AEDPA precedent. Lindh v. Murphy, 521 U.S. 320, 336, 117 S. Ct. 2059, 2068 (1997). Upon grant of a COA, to obtain habeas relief Nichols must demonstrate that the state court proceeding "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United

---

[5] We agree with the district court that the state habeas court made a scrivener's error where, at one point, it appears to endorse a conclusion that Ishman's testimony was material. All of the court's other findings and conclusions cut against this isolated discrepancy.

11

States." 28 U.S.C. § 2254(d)(1). A state court's decision falls within this rubric "if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." Williams v. Taylor, 529 U.S. 362, 413, 120 S. Ct. 1495, 1523 (2000). A state court decision may also qualify under § 2254(d)(1) "if the state court identifies the correct governing legal principle from the Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. at 413, 120 S. Ct. 1523. Under § 2254(d)(1), we need only determine whether the state court's application of clearly established federal law was objectively unreasonable. Neal v. Puckett, 286 F.3d 230, 236 (5th Cir. 2002) (en banc), cert. denied, 537 U.S. 1104, 123 S. Ct. 963 (2003). "We have no authority to grant habeas corpus relief simply because we conclude, in our independent judgment, that a state supreme court's application of [federal law] is erroneous or incorrect." Id., 286 F.3d at 236. Pursuant to the express dictates of AEDPA, "a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. 2254(e)(1). Further, we review the district court's findings of fact for clear error, and its conclusions of law de novo. Finley v. Johnson, 243 F.3d 215, 218 (5th Cir. 2001).

12

## V. DISCUSSION

On appeal, Nichols maintains that the State violated his Brady right to be informed of exculpatory evidence by suppressing Ishman's location and complete identifying information. Nichols assigns prejudicial error to the State's purported Brady infraction, contending that: (1) Ishman's testimony contradicted Johnson's testimony regarding what, if any, actions Shaffer took in the moments before he was shot; (2) the federal district court's findings regarding the State's use of Johnson's testimony conflicts with that of the state habeas court; and (3) Ishman's testimony undermines the guilt and punishment verdicts rendered by the jury. The federal district court, although skeptical about the State's conduct with regard to Ishman's whereabouts and testimony,[6] found that Nichols failed to demonstrate that Ishman's testimony would have been material under Brady.

Pursuant to Brady, "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87, 83 S. Ct. at 1196-97 (1963) (emphasis added). Thus, to state a successful Brady claim on habeas, Nichols must show: (1) suppression by the State; (2) the exculpatory nature of

---

[6] The district court expressly refused to decide whether the "troubling facts" surrounding the State's nondisclosure of Ishman's correct name and location constituted suppression for Brady purposes.

13

the evidence; and (3) materiality.  In re Smith, 142 F.3d 832, 836 (1998).  A Brady violation is not cognizable absent materiality.  United States v. Agurs, 427 U.S. 97, 109-10, 96 S. Ct. 2392, 2400 (1976).  "[E]vidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.  A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome."  United States v. Bagley, 473 U.S. 667, 682, 105 S. Ct. 3375, 3383 (1985).  If the suppressed information, although favorable, could not reasonably cast the entire case in a light that undermines confidence in the jury's verdict, then the information is not material and there is no constitutional violation of the petitioner's Fifth Amendment rights.  See Kyles v. Whitley, 514 U.S. 419, 435, 115 S. Ct. 1555, 1566 (1995) (clarifying that this review is not for evidentiary sufficiency).[7]

The district court deferred to the state habeas court findings that although Ishman's testimony would have been in some respects favorable to Nichols, her testimony was not material to Nichols' case in light of the record as a whole.  Nichols principally maintains here, as he did below, that Ishman's testimony would have impeached Johnson's testimony, which Nichols

---

[7]     Additionally, this Court has held that a Fourteenth Amendment violation will not lie "if the defendant, using reasonable diligence, could have obtained the information...."  In re Smith, 142 F.3d at 836.  However, this rule, cited by the State, is inapposite where, as here, we have no cause to question the lower court findings that Nichols could not have, through due diligence, located Ishman without her correct name and address in Louisiana.

14

characterizes as the sole basis for the State's position that Nichols killed Shaffer. Ishman would have "proved" that Nichols did not kill Shaffer, and this demonstration allegedly undermines confidence in the jury's findings on guilt and capital punishment.

Taking as true the substance of Ishman's testimony, despite its contradictions[8] — Ishman's assertion that Johnson could not have witnessed Shaffer pulling a gun and her claim that she saw Shaffer draw a gun before Nichols and Williams shot at him — is constitutionally immaterial to Nichols' guilt/innocence or capital punishment. First, with regard to the guilt phase of trial, regardless whether he fired the fatal shot or was guilty for party liability under Texas law,[9] the jury was correctly informed that a defendant committing a violent felony cannot claim self-defense.[10] Ishman's testimony is factually immaterial under Brady because, despite Nichols' attempt to inflate the import of Johnson's testimony on points which could have been undermined by Ishman's testimony, other evidence in the record supported the State's contentions that Shaffer never drew a gun and that Nichols fired

---

[8]     Ishman's statements in 1992 and 1997 are hardly consistent on several points, e.g., whether Cindy Johnson could have witnessed the shooting; whether Johnson actually saw Shaffer with a gun in hand; at what point she ran to the back of the store; when she spoke to the police. Moreover, her use of multiple names and reluctance to aid the investigation because of her own troubles with the law would have rendered her testimony somewhat vulnerable.

[9]     Tex. Pen. Code §§ 7.01, 7.02.

[10]     See Davis v. State, 597 S.W.2d 358, 360 (Tex. Crim. App. 1980)(holding that a robber has no right of self-defense against his victim); Callins v. Collins, 998 F.2d 269, 278 (5th Cir. 1993) (recognizing this Texas rule).

15

the fatal shot.  The gun that store owner McDaniel kept behind the deli counter had not been moved and did not have any fingerprints on it.  Additionally, Nichols admitted to his accomplices in the getaway car that he thought he had shot Shaffer in the chest and that Williams had shot Shaffer in the shoulder.  In addition to the testimony just cited, Nichols fully confessed, inter alia, that he planned the robbery; entered the deli; drew his weapon at Shaffer; demanded money; and shot Shaffer as Shaffer bent down to retrieve something.

The critical issue in this case is whether Ishman's testimony would have been helpful to Nichols and therefore material - in the punishment phase.

During argument, Nichols' counsel conceded that the issue of whether the victim, Mr. Shaffer, was shot while he was attempting to retrieve a weapon under the counter was a red herring.[11]  This left the issue of whether Ishman's suppressed testimony would have either undercut any testimony by Johnson that aided the State in establishing that Nichols rather than Williams fired the shot that killed Shaffer or assisted Nichols in establishing that Williams fired the fatal shot.  After a careful review of the record we conclude that there is no material

---

[11]    When asked about the materiality of testimony regarding Shaffer possibly retrieving a weapon, Nichols' counsel conceded that "the gun issue is a red herring" and "doesn't get this petition where it needs to go."

16

difference in the testimony of Johnson and Ishman bearing on whether Nichols or Williams fired the fatal shot.

Both Johnson and Ishman placed the two gunmen in essentially the same position when the initial shots were fired. The medical examiner's opinion that Nichols fired the fatal shot was based primarily on Nichols' position. Because Ishman's testimony did not undermine Johnson's testimony as to the positions of Nichols and Williams relative to Shaffer, Ishman's testimony would not have undercut Johnson's testimony on this point.

Both Johnson and Ishman testified that after the robbers demanded money, Shaffer stooped down and both Nichols and Williams fired at Shaffer. Ishman's testimony, therefore, is not helpful in resolving whether Nichols or Williams fired the fatal shot.

So even if Ishman had testified that Johnson was in the kitchen or the bathroom at the time of the shooting and not in a position to see the robbery and shooting, Ishman's testimony was not materially different from Johnson's. It is true that in the guilt phase of the trial the prosecutor argued: "and I'll tell you that it was [Nichols'] hand that did the killing. How do you know that? Cindy [Johnson] saw it. She told you."

What Johnson actually testified to was that after two or three shots were fired by either or both of the robbers she saw Shaffer go down and saw him bleeding from the side. Contrary to the prosecutor's argument, Johnson's testimony in this respect was

17

not helpful in resolving whether Nichols or Williams fired the shot that produced the injury that caused Shaffer to fall to the floor.

So stripped to its essence both Johnson and Ishman stated that both Nichols and Williams were pointing pistols at Shaffer, and shortly thereafter multiple shots were fired by one or both robbers. Johnson testified that as she ran toward the back of the store she saw Shaffer go down; this was a detail that Ishman did not address. Both Johnson and Ishman heard one or more shots fired after they ran to the back of the deli. This is presumably the shot Williams fired after he came back into the store to grab the cash box. As far as the initial shots that were fired — which both Johnson and Ishman claimed to have witnessed — both thought that Nichols and Williams fired shots at Shaffer. Under these circumstances we conclude that had the State disclosed Ishman's identity and location so that she could have been called by Nichols as a witness, her testimony would not have contradicted Johnson's testimony in any material way insofar as establishing whether Nichols rather than Williams fired the fatal shot.

Nichols would have us focus on only that part of Ishman's testimony in which she stated that Johnson was already in the restroom when Ishman ran from the store and therefore Johnson was not in a position to have seen the shooting. But Nichols cannot choose selected portions of Ishman's testimony to the exclusion of others. He must establish that Ishman's testimony in its entirety would have materially benefitted his defense. Nichols has not

18

persuaded us from this record that Ishman's testimony would have achieved this result. See, e.g., <u>Miller v. Dretke</u>, 431 F. 3d 241, 245 (2005)("In determining whether evidence is material for <u>Brady</u> purposes, we must consider the cumulative effect of all suppressed evidence, rather than ruling on each item individually.")(citing <u>Kyles v. Whitley</u>, 514 U.S. 419, 436-37 (1995).

Because we are unpersuaded that the absence of Ishman's testimony undermines confidence in the reliability of the jury's guilt and punishment verdicts, we affirm the district court's conclusion that the state courts did not act contrary to or unreasonably apply Supreme Court precedents regarding <u>Brady</u> violations in finding Ishman's testimony immaterial. Accordingly, we AFFIRM the judgment denying habeas relief.

**AFFIRMED.**